RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0330p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEROME R. MIKULSKI; ELZETTA C. MIKULSKI, On
Behalf of Themselves and All Others Similarly
Situated,

*Plaintiffs-Appellants,*

*v.*

CENTERIOR ENERGY CORPORATION; FIRST ENERGY
CORPORATION; CLEVELAND ELECTRIC
ILLUMINATING COMPANY; THE TOLEDO EDISON
COMPANY,

*Defendants-Appellees.*

No. 03-4486

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 02-02440; 03-00191; 03-00192; 03-07043
—Donald C. Nugent, District Judge.

Argued: September 13, 2006

Decided and Filed: August 21, 2007

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE,
CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, McKEAGUE, and GRIFFIN, Circuit
Judges.

---

## COUNSEL

**ARGUED:** Eric H. Zagrans, ZAGRANS LAW FIRM, Elyria, Ohio, for Appellants. Mitchell G.
Blair, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellees. **ON BRIEF:** Eric H.
Zagrans, ZAGRANS LAW FIRM, Elyria, Ohio, Eben O. McNair IV, SCHWARZWALD &
McNAIR, Cleveland, Ohio, Robert D. Gary, Lorain, Ohio, Thomas R. Theado, GARY, NAEGELE
& THEADO, Cleveland, Ohio, for Appellants. Mitchell G. Blair, Colleen M. O'Neil, Tracy S.
Johnson, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellees.

BATCHELDER, J., delivered the opinion of the court, in which BOGGS, C. J., GILMAN,
GIBBONS, ROGERS, SUTTON, McKEAGUE, and GRIFFIN, JJ., joined. DAUGHTREY, J. (pp.
17-19), delivered a separate opinion concurring in part and dissenting in part, in which MARTIN,
MOORE, COLE, and CLAY, JJ., joined.

1

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  The issue to be decided in the present case is whether the substantial-federal-question doctrine provides federal subject-matter jurisdiction over a state law claim on the basis that an embedded element of the claim concerns 26 U.S.C. § 312(n)(1), an accounting rule in the federal tax code.  We hold that it does not.

## I.

Plaintiffs Jerome and Elzetta Mikulski filed a class action suit against Centerior Energy Corporation ("Centerior")[1] in the Cuyahoga County (Ohio) Court of Common Pleas, alleging fraudulent misrepresentation and breach of contract.  For ease of introduction, we can ignore certain details until later in the analysis and set out the underpinnings of this case without all their rough edges.  Simply put, Centerior interpreted 26 U.S.C. § 312(n)(1) to mean that, beginning with its 1985 fiscal year, it could no longer deduct certain interest expenses from its calculation of taxable earnings.  Therefore, Centerior did not deduct these expenses from its earnings, which made Centerior appear more profitable but also increased Centerior's tax liability.  Because Centerior declared and distributed dividends based on these reported earnings, the increased tax liability was passed on to its shareholders via IRS forms 1099-DIV.

The plaintiffs contend that Centerior's interpretation of § 312(n)(1), in regard to this particular interest expense, was not only incorrect, but was fraudulent.  The plaintiffs accuse Centerior of *intentionally* overstating its earnings and profits during the time periods in question, in order to make itself appear more profitable.  In what turned out to be a critical response to an interrogatory, the plaintiffs explained their theory in terms of 26 U.S.C. § 312:

> Section 312(n)(1) states that no construction expenses incurred before January 1, 1985, may be considered in calculating a corporation's earnings and profits.
>
> Centerior [] included in its earnings and profits calculations for 1986 (and subsequent years) more than $1.5 billion of construction expenses that its subsidiaries had incurred in 1984 and earlier.
>
> [Therefore,] Centerior violated the Internal Revenue Code by doing what Section 312(n)(1) of the Code specifically forbids.

Pls.' Supp. Resp. to Interrog. No. 1 of Defs.' Second Set of Interrogs (rearranged from original). To be clear, these "construction expenses" are actually interest expenses on long-term construction loans that span the years in question, which are labeled "construction period carrying charges" in § 312(n)(1).  Section 312(n)(1) actually states: "In the case of any amount paid or incurred for construction period carrying charges . . . no deduction shall be allowed with respect to such amount," and there is no date provision in the codified statute.  The essential point of this interrogatory response, however, is that it invoked federal law, namely § 312(n)(1), as the basis for the plaintiffs' state law claim.  Thus, the plaintiffs' contend, based on this interpretation of § 312(n)(1), that Centerior (by overstating its earnings and profits) misrepresented to its shareholders

---

[1] The complaint also named Centerior's successor company, First Energy Corporation, as a defendant. Subsequently, the Mikulski plaintiffs filed three additional class-action complaints, asserting identical claims for three other tax years and also naming Cleveland Electric Co. and Toledo Edison as defendants. The district court consolidated the four lawsuits and the defendants are hereafter referred to collectively as "Centerior."

(via IRS forms 1099-DIV) that their dividends were taxable, which caused those (now plaintiff-class) shareholders to erroneously overpay their federal and state income taxes.

Centerior disputed the plaintiffs' interpretation of § 312(n)(1), particularly its effective date[2] provision, which led to the question of whether § 312(n)(1) applied only to interest expenses actually incurred after January 1, 1985 (as the plaintiffs argued), or if it instead applied to accumulated interest expenses that related to construction projects that remained ongoing after January 1, 1985 (as Centerior had assumed).  The plaintiffs concede that their claim will fail under the latter construction; if Centerior complied with the accounting requirements in the statute, then it would not be culpable for overstating its taxable earnings and profits or misreporting taxable dividends.

Centerior removed the case to federal court by asserting, based on the plaintiffs' response to the above-referenced interrogatory, that the complaint raised a substantial federal question, the resolution of which was essential to the disposition of the plaintiffs' claims.  The plaintiffs moved for a remand to state court, and the district court denied the motion, finding that the plaintiffs' cause of action, although presented as breach of contract and fraudulent misrepresentation, was actually aimed at a tax refund and raised a substantial federal question involving federal tax law.

Centerior next filed a motion for judgment on the pleadings, arguing that the action was expressly preempted by 26 U.S.C. § 7422, and implicitly preempted by the scope and complexity of the Internal Revenue Code.  The district court referred the case to a magistrate judge who recommended judgment on the pleadings and documented three findings.  First, the plaintiffs could have raised the issue with the IRS, filed for a refund, or pursued administrative remedies, but they did not.  Second, if the court allowed the lawsuit to proceed, then it could be opening the federal courts to litigation by every shareholder for misstatement of earnings and profits, by every employee for overstatement of earnings on W-2 forms, and by every independent contractor for an overstated 1099 form.  Third, the Internal Revenue Code was designed to avoid these types of actions and instead allows injured taxpayers to proceed directly against the government for a refund.

The plaintiffs objected to the magistrate judge's report and recommendation, arguing that its principal error was in mischaracterizing their claim as one for a tax refund, which led to the erroneous conclusion that the claims were preempted by federal tax law.  At a hearing before the district court, the plaintiffs refuted preemption and once again disputed removal jurisdiction.  The plaintiffs emphasized that their suit was based on state law claims for breach of contract and fraud, not the alleged violation of the Internal Revenue Code.  The district court rejected the plaintiffs' arguments, adopted the magistrate judge's recommendation, and granted judgment on the pleadings in favor of Centerior.  The district court concluded that the complaint relied on the interpretation of the Internal Revenue Code, and therefore jurisdiction was proper based on either preemption or a substantial question of federal law.  The district court granted judgment on the pleadings based on the plaintiffs' failure to exhaust their remedies with the IRS.

The plaintiffs appealed to this court on the issue of federal subject-matter jurisdiction. *Mikulski v. Centerior*, 435 F.3d 666, 671 (6th Cir. 2006) (rehearing *en banc* granted, opinion vacated Apr. 26, 2006).  The majority reversed, finding that the district court had misapplied both the preemption and the substantial-federal-question doctrines, and consequently lacked subject-matter jurisdiction.  The entire panel agreed that the district court had erred in finding the plaintiffs' claims preempted by 26 U.S.C. § 7422.  The majority further held that the mere presence of a federal statute

---

[2] The effective date was not codified, but was stated in the Act:  "The provisions of paragraphs (1), (2), and (3) of section 312(n) of the Internal Revenue Code of 1954 (as added by subsections (a) [of this section of this Act]) shall apply to amounts paid or incurred in taxable years beginning after September 30, 1984."  Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 61(e), 98 Stat. 494 (1984).  Centerior operates on a calender fiscal year, so the "taxable year beginning after September 30, 1984" was Centerior's fiscal year beginning on January 1, 1985.

as an element of a claim does not present a substantial federal question. The dissent relied on *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), to argue that the federal government has a substantial interest in the construction of 26 U.S.C. § 312(n)(1) because it affects the amount of federal tax a security holder must pay.

Centerior petitioned for rehearing *en banc*, asking: "Whether federal question jurisdiction exists over state law claims when plaintiffs' recovery depends upon a contested interpretation of federal tax law?" This court granted the rehearing and vacated the panel opinion.

## II.

When a decision on subject-matter jurisdiction concerns pure questions of law or application of law to the facts, this court conducts a *de novo* review. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 463 F.3d 473, 475 (6th Cir. 2006). If the district court's jurisdictional ruling was based on the resolution of factual disputes, then we review those findings for clear error. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). The issue before us in this case is primarily a question of law or an application of the law to the given circumstances. The district court produced few factual findings in resolving the jurisdictional question in this case.

This is a case in which Ohio citizens sued an Ohio corporation in Ohio state court, and the defendant corporation removed the case to federal court. Let there be no doubt that the plaintiffs would prefer to be in state court. In the absence of diversity, a defendant may remove a civil action from state court to federal court only if the *plaintiff's* allegations establish "original jurisdiction founded on a claim or right arising under" federal law. 28 U.S.C. § 1441(b). "To determine whether the claim arises under federal law, we examine the 'well pleaded' allegations of the complaint and ignore potential defenses[.]" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). Even "a defense that relies on the preclusive effect of a prior federal judgment or the pre-emptive effect of a federal statute will not provide a basis for removal." *Id*. (citations omitted).

There are exceptions to the well-pleaded complaint rule. *Id*. One exception is the artful-pleading doctrine: plaintiffs may not "avoid removal jurisdiction by artfully casting their essentially federal law claims as state-law claims." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (quotation marks, citations, and edits omitted). A related exception is the complete-preemption doctrine: removal is proper "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Beneficial Nat'l Bank*, 539 U.S. at 8. A third exception is the substantial-federal-question doctrine, which applies "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983). Thus, under limited circumstances, a defendant may force a plaintiff into federal court despite the plaintiff's desire to proceed in state court.

We are mindful that state courts are generally presumed competent to interpret and apply federal law. *See Zwickler v. Koota*, 389 U.S. 241, 245 (1967) ("During most of the Nation's first century, Congress relied on the state courts to vindicate essential rights arising under the Constitution and federal laws."). As the Seventh Circuit recently noted, "there is nothing unusual about a court having to decide issues that arise under the law of other jurisdictions; otherwise there would be no field called 'conflict of laws' and no rule barring removal of a case from state to federal court on the basis of a federal defense." *Hays v. Cave*, 446 F.3d 712, 714 (7th Cir. 2006). The Supreme Court has explained this rule against removal on the basis of a federal defense:

> Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution. For better or worse, under the present statutory scheme as it has existed since 1887, a defendant

may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law.

*Franchise Tax Bd.*, 463 U.S. at 10 (quotation marks, citations, and edits omitted).

Resolution of this appeal will require an inquiry into the federal interest in having the federal issue decided by a federal court, and we acknowledge this otherwise axiomatic premise — that state courts are competent to interpret and apply federal law — in order to ensure that we do not misconstrue the nature of the federal interest or become misled by some histrionic fear that allowing state courts to decide federal law issues might lead to some disastrous consequence, such as 50 irreconcilable interpretations of the tax code, a potential race to the bottom, or diminished federal tax revenues. While there is certainly a significant federal interest in avoiding each of these consequences, the simple fact is that these are *not* the types of consequences to be considered by *courts*. The legal analysis that guides this decision does not include consideration of the *effect* of state versus federal adjudication on the outcome of any given case or issue. "[I]t is up to Congress, not the federal courts, to decide when the risk of state-court error with respect to a matter of federal law becomes so unbearable as to justify divesting the state courts of authority to decide the federal matter." *Beneficial Nat'l Bank*, 539 U.S. at 21 (Scalia, J., dissenting). Thus, our inquiry is ultimately one of congressional intent, not policy or personal preference.

### III.

Under the artful-pleading doctrine, a federal court will have jurisdiction if a plaintiff has carefully drafted the complaint so as to avoid naming a federal statute as the basis for the claim, and the claim is in fact based on a federal statute. *Franchise Tax Bd.*, 463 U.S. at 22. A defendant raising this doctrine may not rely on facts not alleged in the complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 397 (1987). "Although occasionally [a] removal court will seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization, most of them correctly confine this practice to areas of the law pre-empted by federal substantive law." *Id.* at 397 n.11 (quotation marks and edits omitted) (citing *Federated Dep't Stores*, 452 U.S. at 410 n.6 (Brennan, J., dissenting)). Thus, artful pleading and preemption are closely aligned.

Accepting the possibility that the plaintiffs may have carefully structured their complaint to avoid federal jurisdiction, we consider whether the facts alleged in the complaint actually implicate a federal cause of action. The plaintiffs have asserted two state, common-law causes of action: breach of contract[3] and fraudulent misrepresentation.[4] The complaint specifies, in pertinent part:

23. . . . A shareholder's stock certificate constitutes a written contract with the issuing corporation.

24. Pursuant to relevant provisions of the Internal Revenue Code, including [] Section 6042(c), a corporation paying dividends to its shareholders is obligated to issue an accurate [IRS] Form 1099-DIV (or a substitute form) to its shareholders.

---

[3] Under Ohio law, the elements of a common law breach of contract are (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant unlawfully failed to fulfill his obligations, and (4) that damages resulted from this failure. *Lawrence v. Lorain County Cmty. Coll.*, 713 N.E.2d 478, 480 (Ohio App. 1998).

[4] Under Ohio law, the elements of common law fraudulent misrepresentation are: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Burr v. Stark County Bd. of Comm'rs*, 491 N.E.2d 1101, 1102 (Ohio 1986) (paragraph two of the syllabus).

. . .

28. Thus, by virtue of its written contract with its shareholders, Centerior was contractually required accurately to report dividends and returns of capital to every shareholder. To the extent such contractual obligations may not be specifically stated in the written contract, such contractual terms are implied by operation of law.

29. Centerior breached its written contract with the Plaintiff class [] by misreporting to class members [] the portion of the 1986 distributions which constituted taxable dividends and the portion which constituted a return of capital.

30. Furthermore, in order for Centerior to fulfill its contractual obligation accurately to report shareholder dividends and returns of capital, Centerior had the additional obligation accurately to calculate its earnings and profits and the E&P of its subsidiaries.

31. Centerior also breached its written contract with the Plaintiff class [] when it inaccurately calculated earnings and profits for purposes of determining the portion of 1986 distributions which constituted taxable dividends, and thereby understated that portion of the distributions which constituted a return of capital.

32. Centerior's misreporting caused the members of the Plaintiff class [] to overpay their respective income taxes for 1986 and all other relevant periods.

33. As a direct and proximate result of such overpayment, the members of the Plaintiff class [] have been damaged in the amount of such overpayment, which damages can be calculated for each class member [] on a class-wide basis.

So, both causes of action rely on the same premise: that Centerior overstated the amount of taxable dividends it distributed in 1986 (and three other years), which caused its shareholders to overpay their federal and state income taxes. Importantly, the plaintiffs do *not* state or imply a federal Securities Exchange Act claim, in which investors allege that they were harmed through the purchase or sale of mispriced shares.[5] These plaintiffs allege a traditional tort and breach of contract.

In July 1996, Congress enacted 26 U.S.C. § 7434 as part of the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452 (1996), and created a private cause of action against anyone "who willfully files a fraudulent information return" (e.g., IRS form 1099-DIV) that causes injury to the purported recipient. This appears to provide a federal cause of action under the facts alleged in the complaint, but because all of the events giving rise to the plaintiffs' claims preceded the enactment of § 7434 by almost ten years, § 7434 would be unavailable to these plaintiffs for these claims. Furthermore, neither this section of the statute nor the Act itself contains any indication that

---

[5] The plaintiffs clarified their claims in a key interrogatory response, which demonstrates that, under their particular theory, their alleged harm is actually incidental to the alleged wrong:

> From its formation in 1986, [Centerior] deliberately and fraudulently manipulated its tax accounting practices over a period of years in order to artificially inflate its 'earnings and profits' so that it would look more profitable to its investors. This was vitally important to Centerior in 1986 because it needed to justify the recent merger of CEI and Toledo Edison. In the process, however, Centerior defrauded some 200,000 shareholders who lost more than $35 million from being wrongly instructed by Centerior to pay too much in federal income taxes on their 1986 distributions alone.

Pls.' Supp. Resp. to Interrog. No. 1 of Defs.' Second Set of Interrogs. (footnote omitted).

Congress intended it to be the exclusive remedy for a fraudulent overstatement of taxable dividend distributions, so the plaintiffs' claims do not necessarily state a federal claim.

Congress enacted 26 U.S.C. § 312 as part of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984), and § 312 governs certain earnings-and-profits calculations. According to the plaintiffs' complaint, the *reason* Centerior overstated the taxable portion of the distributions (i.e., dividends) was because it miscalculated its earnings and profits. Under the Internal Revenue Code, if a corporation has earnings and profits, then distributions to shareholders are considered *taxable* "dividends" up to the amount of the earnings and profits. 26 U.S.C. § 316(a). But if distributions exceed earnings and profits, then the distributions are considered *tax-free* "returns of capital." *See Lewis v. CIR*, 18 F.3d 20, 23 (1st Cir. 1994); *Luckman v. CIR*, 418 F.2d 381, 383 (7th Cir. 1969). While we agree that § 312 affects the measure and calculation of a corporation's earnings and profits, it is only a guideline or instruction on proper tax accounting practices. It does not include a civil suit provision or implicitly create a private cause of action. Similarly, 26 U.S.C. § 6042, which governs the reporting of dividend payments and the reporting of earning and profit calculations, does not state or imply a private cause of action either.

Therefore, we must conclude that the Mikulski plaintiffs would not have had a federal, statutory cause of action against Centerior on these or similar claims; that is, none of these statutes provides a federal cause of action that might have been invoked by a less artfully drafted complaint. We cannot conclude under these facts that the plaintiffs carefully drafted their complaint to avoid a federal statute or federal cause of action. *See Franchise Tax Bd.*, 463 U.S. at 22.

**IV.**

The complete-preemption doctrine applies in circumstances in which Congress may intend the preemptive force of a federal statute to be so extraordinary that "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393. The Supreme Court has found complete preemption in only three classes of cases: Section 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185; the Employee Retirement Income Security Act of 1975 (ERISA), 29 U.S.C. §§ 1001-1461; and the National Bank Act, 12 U.S.C. § 38. *See Beneficial Nat'l Bank*, 539 U.S. at 7-9. Complete preemption requires a finding that "the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action." *Id.* at 7-8. To date, the Supreme Court has not found complete preemption over claims that allege misreporting by corporations to their taxpaying shareholders.

This circuit has recognized that complete preemption is a limited rule. Although we held that the National Flood Insurance Act, 42 U.S.C. § 4072, completely preempts state law because it explicitly confers "original exclusive jurisdiction" on the federal district courts, *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 947 (6th Cir. 2002), we have declined to extend complete preemption to various statutes that lack similarly explicit language. *See*, *e.g.*, *Wellons v. Nw. Airlines, Inc.*, 165 F.3d 493, 496 (6th Cir. 1999) (denying complete preemption under the Airline Deregulation Act); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1253 (6th Cir. 1996) (Airline Deregulation Act); *Strong v. Telectronics Pacing Sys., Inc.*, 78 F.3d 256, 259 (6th Cir. 1996) (Medical Device Amendments to Federal Food, Drug, and Cosmetic Act); *Gustafson v. Lake Angelus*, 76 F.3d 778, 783 (6th Cir. 1996) (Federal Aviation Act).

Congress has not created an exclusive federal remedy under the Internal Revenue Code for the miscalculation of earnings and profits or the misreporting of taxable dividends. Congress knows how to enact exclusive private rights of action when it chooses to do so, *see Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 176-77 (1994), and several provisions in the tax code expressly prescribe an exclusive, private federal remedy. *See*, *e.g.*, 26 U.S.C. § 6110(j)(1)(B) ("shall have as

an exclusive federal remedy"); 26 U.S.C. § 897(i)(4) ("the exclusive remedy for any person claiming"); 26 U.S.C. § 7433(a) ("such civil action shall be the exclusive remedy"); 26 U.S.C. § 7433(e)(2)(A) ("petition shall be the exclusive remedy"). In contrast, neither of the provisions relied upon by the Mikulski plaintiffs, 26 U.S.C. § 312(n)(1) or § 6042(c), contains any express statement of an exclusive federal remedy. Even 26 U.S.C. § 7434, which creates a private right of action against a company submitting a fraudulent information return, does not purport to be exclusive.

Under 26 U.S.C. § 7422(a), no private action "shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or . . . of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary." This provision was intended to provide taxpayers with a means to obtain relief from improper collections by tax collectors while also protecting government collection officers from being sued by taxpayers. *See* S. Rep. No. 89-1625 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3676, 3681-82. We find no indication that Congress intended this tax refund procedure to be a security holder's exclusive remedy for a company's misreporting of dividends. *Id.* Although the federal courts have broadened § 7422 in the "airline cases" and applied it to airlines that effectively act as agents for the IRS by collecting excise taxes from passengers, *see*, *e.g.*, *Brennan v. Sw. Airlines Co.*, 134 F.3d 1405, 1409 (9th Cir. 1998); *Sigmon v. Sw. Airlines Co.*, 110 F.3d 1200, 1203 (5th Cir. 1997); *Kaucky v. Sw. Airlines Co.*, 109 F.3d 349 (7th Cir. 1997), that expansive application does not extend to the present case because Centerior did not collect or withhold any taxes. Centerior was not acting as a collection agent for or on behalf of the IRS. *See In re Air Transp. Excise Tax Litig.*, 37 F. Supp. 2d 1133, 1137 (D. Minn. 1999) (limiting the applicability of the airline cases to their unique circumstances).

The mere fact that the plaintiffs' damages are calculated in terms of overpaid income taxes does not necessitate the conclusion that the plaintiffs' claim must actually be one for a federal income tax refund. *Cf. Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 453 (6th Cir. 2003) (the underlying damages do not dictate the nature of a plaintiff's claim). This is especially so for the claim of *state* income taxes — the plaintiffs' alleged overpayment of *state* income taxes obviously does not assert a federal income tax refund claim. Perhaps more to the point, however, is that the plaintiffs are not seeking a tax refund inasmuch as they are not accusing the IRS of any wrongdoing. Under the plaintiffs' theory, the IRS was an innocent third-party, who, like the plaintiffs themselves, merely relied on the 1099-DIVs issued by Centerior, while Centerior was the active (i.e., liable) tortfeasor. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. --, 126 S. Ct. 1991, 2003-04 (2006) (Thomas, J., concurring) (noting that "courts have historically found proximate causation . . . [even] for injuries where an innocent third party intervenes between the tortfeasor and the victim, such that the innocent third party is the immediate cause of the injury" (citation and emphasis omitted)). The same reasoning applies to the plaintiffs' breach of contract claim. We therefore conclude that 26 U.S.C. § 7422 does not preempt the present case.

The plaintiffs' claims are not completely preempted by federal law and the district court erred by concluding that they were. We find no basis for federal subject-matter jurisdiction based on the well-pleaded complaint, the artful-pleading doctrine, or complete preemption.

## V.

Under the substantial-federal-question doctrine, a state law cause of action may actually arise under federal law, even though Congress has not created a private right of action, if the vindication of a right under state law depends on the validity, construction, or effect of federal law. *See Franchise Tax Bd.*, 463 U.S. at 9; *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912). "As an initial proposition, then, the 'law that creates the cause of action' is state law, and original federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law

is a necessary element of one of the well-pleaded state claims, or that one or the other claim is 'really' one of federal law." *Franchise Tax Bd.*, 463 U.S. at 13. The mere presence of a federal issue in a state law cause of action does not automatically confer federal question jurisdiction, either originally or on removal. Such jurisdiction remains exceptional and federal courts must determine its availability, issue by issue. The Supreme Court has developed a standard, through an evolving case line, by which the federal interest in providing a forum for an issue is weighed against the risk that the federal courts will be unduly burdened by a rush of state law cases.

In *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921), the Supreme Court first acknowledged that federal jurisdiction may exist over an ordinary state-law cause of action where "the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable." In *Smith*, a shareholder sued in federal court to prevent a company's directors from breaching their duty to the shareholders, as set out by the state's laws of incorporation. *Id.* at 214 (Holmes, J., dissenting). Specifically, the plaintiff alleged that the Federal Farm Loan Act was unconstitutional, and therefore, an investment in bonds issued under that Act would result in a defendant's breach of duty. *Id.* at 198. The Supreme Court, raising the jurisdictional question *sua sponte*, ultimately determined that federal jurisdiction was proper because of the significant federal interest in determination of the constitutionality of a federal statute. *Id.* at 201-02. Subsequent cases have narrowed and refined the rule.

In *Moore v. Chesapeake & Ohio Railway Co.*, 291 U.S. 205, 208 (1934), a railroad employee sued his employer under the Kentucky Employers' Liability Act, alleging that he was injured by defective equipment. Under the state law, a violation of the Federal Safety Appliance Acts constituted negligence *per se* and eliminated the defenses of contributory negligence and assumption of risk. *Id.* at 212-13. The Supreme Court determined that federal jurisdiction was lacking because the federal interest in a state law tort action was not significant. "The action fell within the familiar category of cases involving the duty of a master to his servant . . . . The Federal statute, in the present case touched the duty of the master at a single point, and . . . the right of the plaintiff to recover was left to be determined by the law of the state." *Id.* at 216-17.

Therefore, in the early cases, the Court decided substantial-federal-question jurisdiction based solely on the magnitude of the federal interest. These two cases in particular highlight a distinction between the *significant* federal interest in deciding the constitutionality of a federal statute, a potential rebuke of congressional authority, as compared with the *minimal* federal interest in the shaping of the scope of a state statutory duty, a task likely to recur routinely and repeatedly. The Court has since added another dimension: the desire to protect the federal courts from the burden of excessive litigation that is better suited to state courts.

In *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 805-06 (1986), the plaintiffs sued a drug company on a state law tort claim, alleging that the drug company was presumptively negligent because it had violated the branding provision of the federal Food, Drug, and Cosmetic Act. In what appeared to be a departure from the federal-interest-based approach, the Court introduced new factors, explaining that "the very reasons for the development of the modern implied remedy doctrine — . . . [including] the increased volume of federal litigation . . . — are precisely the kind of considerations that should inform the [substantial-federal-question decision]." *Id.* at 811 (quotation marks and citations omitted). Under this approach, the Court placed significant emphasis on the absence of a federal statutory cause of action: "the congressional determination that there should be no federal remedy for the violation of this federal statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently substantial to confer federal-question jurisdiction." *Id.* at 814 (quotation marks omitted). Based primarily on the absence of a "private, federal cause of action," the Court concluded that federal jurisdiction was lacking. *Id.* at 817.

In *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. at 310-11, the plaintiff filed a state law claim to quiet title, alleging that the defendant's record title was invalid because the IRS, in seizing the plaintiff's property to satisfy a federal tax deficiency, had failed to give the plaintiff proper notice pursuant to 26 U.S.C. § 6335(a). Although the complaint did not set forth a federal cause of action, the Court recognized that the state law claim presented a question of federal law. But this recognition did not end the inquiry as to whether the action "arose under" federal law; it triggered further considerations. The Court observed, "the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction [i.e., in the balance of federal and state judicial responsibilities]." *Id.* at 314.

In *Grable*, the Supreme Court, for the first time, brought its two concerns together into a single standard, which it described as "the framework of examining the importance of having a federal forum for the issue, and the consistency of such a forum with Congress's intended division of labor between state and federal courts." *Id.* at 319. The Court then recognized that *Grable*'s particular federal issue implicated the ability of the federal government (i.e., the IRS) "to vindicate its own administrative action." *Id.* at 315. The Court also acknowledged that the rarity of this issue would "portend only a microscopic effect on the federal-state division of labor." *Id.*

Because 26 U.S.C. § 6335(a), the federal tax code provision at issue in *Grable*, did not provide for a private, federal cause of action, the Court was compelled to reconcile its decision with its earlier opinion in *Merrell Dow*. *Id.* at 316-19. To do this, the Court introduced the "welcome mat" metaphor:

> [*Merrell Dow*] saw the missing cause of action not as a missing federal door key, always required, but as a missing welcome mat, required in the circumstances, when exercising federal jurisdiction over a state [] action would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues. For if the federal labeling standard without a federal cause of action could get a state claim into federal court, so could any other federal standard without a federal cause of action. And that would have meant a tremendous number of cases.

> One only needed to consider the treatment of federal violations generally in garden variety state tort law. The violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings. A general rule of exercising federal jurisdiction over state claims resting on federal [] statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal courts. Expressing concern over the increased volume of federal litigation, and noting the importance of adhering to legislative intent, *Merrell Dow* thought it improbable that the Congress, having made no provision for a federal cause of action, would have meant to welcome any state-law tort case implicating federal law solely because the violation of the federal statute is said to create a rebuttable presumption of negligence under state law. In this situation, no welcome mat meant keep out. *Merrell Dow*'s analysis thus fits within the framework of examining the importance of having a federal forum for the issue, and the consistency of such a forum with Congress's intended division of labor between state and federal courts.

*Id.* at 318-19 (internal quotation marks, citations, footnotes, and edits omitted). The *Grable* Court held that, in regard to the IRS's pre-seizure notice provision, as implicated by a quiet title action, the balance favored federal jurisdiction. *Id*. at 319-20.

In *Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. --, 126 S. Ct. 2121, 2126-27 (2006), the plaintiff was a health plan administrator operating pursuant to the Federal Employees

Health Benefits Act who sued to share in the defendant's damage award obtained in a state court personal injury suit. The Court did not shut the jurisdictional door propped open in *Grable*, but it made clear that *Grable* is to be read narrowly: "*Grable* emphasized that it takes more than a federal element to open the 'arising under' door. This case cannot be squeezed into the slim category *Grable* exemplifies." *Id.* at 2137 (internal quotation marks omitted). The Court also summarized the factors that established the significance of the federal interest in *Grable*: "The dispute there [1] centered on the action of a federal agency (IRS) and its compatibility with a federal statute, [2] the question qualified as 'substantial,' and [3] its resolution was both dispositive of the case and [4] would be controlling in numerous other cases." *Id.* The Court found federal jurisdiction lacking in *Empire* because the state-court tort action was between private parties, the federal issue did not dispose of the case (i.e., "the bottom line practical issue is the share of the settlement properly payable to Empire"), and the federal issue was too "fact-bound and situation-specific" for its resolution to affect numerous other cases. *Id.*

The plaintiffs in the present case seek to rely on Centerior's violation of an accounting provision in the federal tax code to demonstrate that Centerior is liable for fraudulent misrepresentation or breach of contract. From this perspective, the present case most closely resembles *Merrell Dow*'s presumption of negligence for violating the branding provision of the federal Food, Drug, and Cosmetic Act or *Moore*'s application of negligence *per se* for violating the terms of the Federal Safety Appliance Acts, neither of which supported substantial-federal-question jurisdiction. But the present case does not raise a question of mere compliance or noncompliance with a federal statute; the question concerns the meaning of the statute, specifically, the effective date provision. From this perspective, the present case more closely resembles *Smith*'s conclusive determination or *Grable*'s decisive guidance on future application, both of which supported substantial-federal-question jurisdiction. But, unlike *Smith*, the present case does not challenge the constitutionality of the statute, and unlike *Grable*, it does not affect the manner in which the IRS might vindicate its own administrative actions.

We must consider this case in "the framework of examining the importance of having a federal forum for the issue, and the consistency of such a forum with Congress's intended division of labor between state and federal courts." *Grable*, 545 U.S. at 319. The substantial-federal-question doctrine has three parts: (1) the state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; and (3) the exercise of jurisdiction must not disturb any congressionally approved balance of federal and state judicial responsibilities. *Id*. at 314; *accord Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 552 (6th Cir. 2006).

### 1.

The plaintiffs' theory certainly appears to raise a disputed federal issue: whether 26 U.S.C. § 312(n)(1) requires capitalization of only those interest expenses actually incurred after the effective date (as the plaintiffs argue), or if it instead requires capitalization of all accumulated interest expenses associated with construction projects that were ongoing as of the effective date (as Centerior had assumed). The plaintiffs' theory is actually a bit complicated, and this shorthand rendition is convenient but incomplete. The plaintiffs produced an expert report that offered a more precise explanation of the theory, although even this is still decidedly murky:

> By 'capitalize', I mean that for purposes of calculating E&P [i.e., earnings and profits], the interest expense attributable to a certain construction project would not be deducted [from the tabulation of E&P], but [instead would be] added to the cost of the asset being constructed until completion of the project. . . .
>
> Prior to 1983, corporations were not required to capitalize interest on property under construction[;] the interest was deducted [from E&P] as a current

expense[]. Under Section 207 of the Tax Equity and Responsibility Act of 1982, corporations were required to capitalize [(i.e., not deduct from E&P) the] interest on nonresidential real estate construction that began after 1982.

In 1984, Congress amended the IRC and added Section 312(n)(1) to prohibit corporations from deducting [this interest] (and other carrying costs) [from E&P]. The provision was effective for 'amounts paid or incurred in taxable years beginning after September 30, 1984' (Section 61(e)(1)(A) of P.L. 98-369).

. . .

According to the effective date provisions of Section 312(n)(1), interest capitalization was required on [Centerior's] post-1984 construction expenditures. However, [Centerior] capitalized interest on at least $1.5 billion in construction expenditures made *before* 1985 [which was not required by § 312(n)(1)]. As a result, [Centerior] capitalized significantly more [interest] than required by law and overstated E&P for 1985 and 1986 by corresponding amounts.

Since E&P is the source of payment for taxable dividends to shareholders, a significant[ly] overstated E&P would very likely cause a corporation to report distributions to shareholders as their taxable incomes [i.e., dividends], when in fact the shareholders were returned capital investment. As a consequence, shareholders overstated their taxable income and tax liabilities.

Pls.' Supp. Resp. to Interrog. No. 1 of Defs.' Second Set of Interrogs. - Exhibit B (Expert Report).

For our purposes, we can abbreviate the plaintiffs' claim anew: Centerior is alleged to have improperly capitalized (i.e., included in its statements of taxable earnings) some $1.5 billion in pre-1985 construction expenses (interest) on the belief that it was required to do so by § 312(n)(1), while the plaintiffs argue that § 312(n)(1)'s effective date provision excludes any pre-1985 expenses from its capitalization requirement (i.e., the tax code prohibited Centerior from including these expenses in its statements of taxable earnings). Whether due to the parties' confusing descriptions of the issue, the inconsistencies in the language used (i.e., "required" and "prohibited"), or the fact that tax accounting sometimes appears to be a form of modern-day alchemy, it is difficult to frame this dispute with particularity. The plaintiffs have certainly staked their claim on this federal issue, however, and the parties have "crossed swords over it." *Cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 1243 (2006). Moreover, the plaintiffs concede that their claim will fail under Centerior's interpretation of the statute. We therefore have little difficulty in concluding that there is a federal issue and it is actually disputed.

**2.**

The second component is the substantiality of the federal interest. *See Grable*, 545 U.S. at 314. The Supreme Court has identified four aspects of a case or an issue that affect the substantiality of the federal interest in that case or issue: (1) whether the case includes a federal agency, and particularly, whether that agency's compliance with the federal statute is in dispute; (2) whether the federal question is important (i.e., not trivial); (3) whether a decision on the federal question will resolve the case (i.e., the federal question is not merely incidental to the outcome); and (4) whether a decision as to the federal question will control numerous other cases (i.e., the issue is not anomalous or isolated). *See Empire*, 126 S. Ct. at 2137 (analyzing *Grable*, 545 U.S. at 313). While certain of these factors may be more applicable than others in any given set of circumstances, no single factor is dispositive and these factors must be considered collectively, along with any other factors that may be applicable in a given case. In this analysis, we address each factor in turn, and

consider them in aggregate.  Based on our considered judgment of these factors, we ultimately conclude that the federal interest in the present issue is not substantial.

The first factor is both objective and apparent, and in this case it weighs against characterizing the federal interest as substantial because there is no federal agency in this dispute. *See Empire*, 126 S. Ct. at 2137 ("The dispute [in *Grable*] centered on the action of a federal agency (IRS) and its compatibility with a federal statute[.]").  Section 312(n)(1) imposes a duty on citizens (e.g., corporations), not the federal government (or a government agency), and this case involves no question of whether a government agency has complied with a statute or regulation.  *See id*.  While the federal government may have an interest in the uniform application of regulations that relate to the collection of taxes, it has only a limited interest in private tort or contract litigation over the private duties involved in that collection. *See Grable*, 545 U.S. at 319.  The government's ability to collect taxes from an individual shareholder or a corporation is not affected by the resolution of the dispute between these two parties.  The government is free to interpret and apply the tax code as it sees fit, without the slightest regard for this lawsuit.  Unlike *Grable*, in which the IRS's prevailing practice was alleged to violate due process, this case will have no *res judicata* effect that would apply to the IRS, no matter which court, federal or state, decides the case.  In fact, the IRS even has the authority to vindicate its interest by issuing a formal interpretation of this statute via administrative rule making, if it chooses to do so.  *See*, *e.g.*, Staff of the J. Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Tax Reform Act of 1984 177 (Comm. Print 1984) ("It is anticipated that regulations will be issued providing for the allocation of expenditures to the construction period and among different properties.").

The second factor is far more subjective and requires that we decide whether the question to be resolved is important. *See Empire*,126 S. Ct. at 2137.  To be sure, resolution of this issue will require the analysis and interpretation of federal law, specifically the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 61(e), 98 Stat. 494 (1984), and 26 U.S.C. § 312.  But the specific question at issue concerns only the interpretation of the effective date of an accounting provision that instructs companies on how to adjust their earnings and profits calculations to account for certain construction project interest expenses.  This question does not implicate any broader or more substantial issue.  The question does not necessarily even resolve all aspects of the present case, and it will provide little if any precedent for future cases.  In the 22 years since its enactment, the IRS has never issued a rule to interpret the provision, nor — so far as we are aware — has the IRS ever litigated an action involving this provision.  Based on our subjective view of this issue, we find it more likely than not that this particular question is not particularly important to the federal government.

The third factor is objective though the answer is not immediately apparent: whether resolution of this question is dispositive of this case. It is not. *See Empire*, 126 S. Ct. at 2137.  Resolution of this question is dispositive if decided in favor of Centerior, but only because the plaintiffs have conceded as much.  If the plaintiffs prevail on their construction of § 312(n)(1), and show that Centerior miscalculated earnings and profits due to its violation of § 312(n)(1), then the plaintiffs must still prove the remaining elements of fraudulent misrepresentation (such as intent) or breach of contract (such as the existence of a contract).[6]  *See* fns. 3 & 4, *supra*. If, on the other hand, Centerior prevails on its construction and shows that it complied with § 312(n)(1) in calculating its earnings and profits accurately, then the plaintiffs cannot prevail (unless they demonstrate some other misrepresentation or breach of contract).  Therefore, conformity with § 312(n)(1) may, but will not necessarily, conclude the action.

---

[6] Furthermore, even if the plaintiffs prevail, and § 312(n)(1) is held to exclude pre-1985 expenses from its capitalization requirement, might Centerior nonetheless legitimately reply that § 312(n)(1) does not *forbid* that capitalization either — it merely fails to require it?  Or, might Centerior rely on the reasonableness of its interpretation to disprove a culpable mental state, and thereby still avoid liability?

Finally, the fourth factor is again subjective and, as touched upon in the discussion of the second factor, we find that a decision on this particular and very narrow question will not be controlling over numerous other cases.[7] *See Empire*, 126 S. Ct. at 2137. The disputed provision applies only to "construction period carrying charges," a special category of construction costs that includes "interest paid or accrued[,] on indebtedness [that is] incurred or continued [in order] to acquire, construct, or carry property." 26 U.S.C. § 312(n)(1)(B)(i). Furthermore, the particular issue concerns the effective date of September 30, 1984 — some 22 years ago. Finally, "[i]f costs must be capitalized under other provisions of the Internal Revenue Code, then section 312(n)(1) is not applicable." *Von-Lusk v. CIR*, 104 T.C. 207, 220 (1995). Since 1986, corporations such as Centerior have been required to capitalize interest expenses in order to calculate taxable income. 26 U.S.C. § 263A. Thus, the adjustment prescribed by § 312(n)(1) has been at least partially superseded.

Whether the interpretation of § 312(n)(1) is resolved in state court or federal court, the outcome will be the same: companies will report taxable dividends in the manner prescribed by law (i.e., as legislated by Congress and interpreted by the courts). The IRS undoubtedly has an interest in collecting taxes, and it is of no consequence to the IRS whether this case, or any like it, is resolved in federal court rather than the state court. The IRS's ability to collect taxes in accordance with the law is unaffected by the judicial forum. This leads us to our final point on federal interest: § 312(n)(1) does not *control* the IRS's collection of the plaintiffs' income taxes. While § 312(n)(1) may *affect* a shareholder's tax obligations, it will only do so under particular circumstances.

Throughout this case, this appeal, and this opinion to this point, one aspect of the plaintiff's position has generally been accepted: that each shareholder suffered the same damages, which can be measured by the alleged overpayment of state and federal income taxes. Although the district court certified the shareholders as a plaintiff class and the presumption of identical damages has not been challenged, this presumption is highly suspect, and to the extent that this suspect presumption is relied upon or overlooked in this analysis, the true situation is worth acknowledging. Each of the individual shareholders presumably, at least theoretically, falls within a particular (differing) income tax bracket, holds a unique investment portfolio (with different gains, losses, deductions, offsets, writeoffs, tax shields, etc., in any given year), and consequently, pays a different amount of taxes. While the receipt of non-taxable money (i.e., return of capital) is almost always better than taxable money (i.e., dividends), this simple distinction does not automatically lead to an identical effect on each individual shareholder's overall tax obligation, given the complexity of the tax code (and the creativity of tax accountants). For instance, corporate investors pay a lower effective tax rate on dividends than do individual investors. Pension funds and non-profits do not pay taxes on dividends, so for them, the difference is irrelevant for tax purposes. This simple distinction is merely intended to demonstrate that the classification of distributions as taxable dividends, rather than non-taxable returns on capital, does not directly control the payment or collection of personal income taxes.

In concluding this section, we find that each of the four factors identified by the Supreme Court draws us towards a determination that the federal interest in the present issue is not substantial. Taking all four factors into consideration, and acknowledging two unassailable truths — (1) that state courts are fully competent to decide this question, and (2) that § 312(n)(1) does not control the collection of the plaintiffs' personal income taxes *directly* — we conclude that the federal interest in this case is not so substantial that it compels a finding that these traditional state law claims actually "arise under" federal law; not without some statement to that effect by Congress.

---

[7] This factor, which concerns whether a decision on the particular federal question at issue in the litigation will set precedent that will control numerous other cases, is not to be confused with the analysis in Section V.3, *infra*, which concerns whether our holding on the availability of federal subject-matter jurisdiction will set precedent that will affect the jurisdiction of numerous other similarly situated cases.

This is not to say that there is no federal interest or even some significant federal interest; there may very well be, and it might not be difficult to find. But such a finding would be immaterial. The pertinent finding, which leads to our present conclusion, is that the federal interest in this case is not "substantial" as that term has been defined under the prevailing Supreme Court precedent. *See Empire*, 126 S. Ct. at 2137; *Grable*, 545 U.S. at 315; *Moore*, 291 U.S. at 216-17; *Smith*, 255 U.S. at 201-02. If a case could be deemed to "arise under" federal law — and thereby invoke federal jurisdiction — *any time* the litigation involves the interpretation of a provision in the federal tax code, then these precedents — particularly *Grable* — would be meaningless insofar as they attempt to define a federal interest (or to guide the inquiry into Congressional delegation of responsibility). Indeed, the portions of the tax code that expressly provide for a *federal* remedy would be little more than surplusage. We therefore think it would be imprudent to assume that either Congress or the Supreme Court intended such an expansive or limitless view of federal jurisdiction.

### 3.

Even if there were a significant federal interest, we find that the exercise of jurisdiction over this type of lawsuit would impermissibly disrupt the congressionally approved balance of federal and state judicial responsibilities. *See Grable*, 545 U.S. at 315. Congress has made no provision for a federal cause of action under § 312(n)(1). As the Supreme Court explained in *Grable*, "*Merrell Dow* thought it improbable that the Congress, having made no provision for a federal cause of action, would have meant to welcome any state-law tort case implicating federal law solely because the violation of the federal statute is said to create a rebuttable presumption of negligence under state law. In this situation, no welcome mat meant keep out." *Grable*, 545 U.S. 318-19. While *Grable* went on to explain that the absence of a cause-of-action provision is not determinative, this certainly provides a starting point for this part of the analysis.

Under the prescribed standard, we must pursue this question further and inquire into the risk of upsetting the intended balance by opening the federal courts to an undesirable quantity of litigation. *See id.* at 315. This is, to be sure, a speculative inquiry, requiring us to speculate about the consequences for the federal caseload that will flow from this decision, and, although this is intended to be a *reasoned* speculation, we concede that reasonable people can — and no doubt will — disagree over the likelihood or severity of the possible consequences.

While we ultimately conclude that the possibility of encumbering the federal courts with these tax-code-related cases appears both real and significant, or at least not insignificant, we are at pains to avoid overstating our position. We eschew predictions of any extreme outcome that may lurk in such phrases as "flood of litigation" or "overwhelm the federal courts," and we have not succumbed to some eschatological trembling. Rather, we posit an objective and reasoned — albeit necessarily speculative — view that, by allowing the present dispute over a relatively obscure provision of the tax code to be pursued in federal court, we would extend federal jurisdiction not only to the question raised in this case, but to any dispute over the meaning or effect of virtually any provision in the entire federal tax code.

The question is not whether such a holding will open the federal courts to analogous cases — under the most rudimentary concept of legal precedent it certainly will. The pressing questions are what cases would be analogous and how many would there be. This case involves (1) the interpretation of (2) the effective date provision of (3) a construction-expense accounting guideline (4) in the federal tax code. The universe of analogous cases would conservatively include any case that involves (1) the interpretation of (2) any provision that is at least as significant as the effective date provision of (3) any accounting guideline that is at least as significant as construction-industry interest-payment expenses that is (4) in the federal tax code. It is no overstatement to say that this description covers numerous tax code provisions; it may not be an overstatement to say that it covers them all. Examples of such cases abound, including common malpractice actions against tax

preparation professionals or company accountants involving disputed interpretations of tax code provisions; actions by shareholders for misstatement of earnings and profits; actions by employees for overstatement of earnings on W-2 forms or by independent contractors for overstated 1099 forms. Limitation of this universe of analogous cases would — we think — be unlikely.

Even recognizing that there are some limits, such as IRS preemption and statutes of limitation, we are left with the conclusion that finding a substantial federal question in the case we decide today would open the door of the federal courts to significantly more than the solitary case asserting a constitutional challenge, as in *Smith*, 255 U.S. at 214, or the "microscopic effect" portended by the quiet title action in *Grable*, 545 U.S. at 315. And even if the actual number of cases proved not to be overwhelming, or even uncomfortably burdensome, it appears unlikely that Congress — through its silence — intended to open the federal court door quite so wide.

## VI.

The balance here weighs against the propriety of federal jurisdiction, and this case "cannot be squeezed into the slim category [of cases that] *Grable* exemplifies." *See Empire*, 126 S. Ct. at 2137. "The state court in which the [] suit was lodged is competent to apply federal law, to the extent it is relevant, and would seem [suitably] positioned to determine" the application of § 312(n)(1) in the present case. *Id.* We therefore **REVERSE** and **REMAND** to the district court for dismissal for lack of federal subject-matter jurisdiction.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. A majority of the court relies upon two bases for its decision today that federal courts may not exercise jurisdiction over the claims asserted by the plaintiffs in this case. First, the majority concludes "that 26 U.S.C. § 7422 does not preempt the present case." With that determination, I am in full agreement. Second, the majority states that there is no *substantial* federal interest in obtaining a federal court decision regarding the effective date of a provision of the federal Internal Revenue Code that will enhance the ability of a federal agency to collect the monies necessary to carry on the workings of the federal government. Even if the federal interest were held to be substantial, the majority nevertheless contends that we should remand this matter to the state court lest provision of a federal forum would portend an extension of federal jurisdiction that would embroil us in "any dispute over the meaning or effect of virtually any provision in the entire federal tax code," as well as in state malpractice actions, shareholder suits, and other decidedly non-federal disputes. *See* Maj. Op. at 15-16. From these portions of the majority's ruling, I respectfully dissent.

Congress has seen fit to entrust federal district courts with original jurisdiction over "civil actions *arising under* the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (emphasis added). Because the non-diverse plaintiffs in this litigation allege that their suit raises claims based only upon the Ohio *state law* concepts of breach of contract and fraudulent misrepresentation, they argue that any exercise of federal jurisdiction in this matter would be unjustified. As recognized almost 25 years ago by the United States Supreme Court, however, "[e]ven though state law creates [a litigant's] causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13 (1983).

Significantly, the Supreme Court has ruled just two years ago in *Grable & Sons Metal Products, Inc. v. Darue Engineering and Manufacturing*, 545 U.S. 308 (2005), another case from this circuit, that even a state-law action to quiet title can implicate "a substantial federal interest (in construing federal tax law)." *Id.* at 311. In that case, although Grable & Sons filed its complaint in state court against only Darue Engineering and Manufacturing, the entity then in possession of an Internal Revenue Service-issued quitclaim deed to the plaintiff's former property, the Court recognized that the determinative issue involved an analysis of the validity of the notice provided to Grable & Sons by a government agency. Consequently, not only does "[t]he Government . . . [have] a direct interest in the availability of a federal forum to vindicate its own administrative action . . .," *id.* at 315, but "*the national interest in providing a federal forum for federal tax litigation is sufficiently substantial* to support the exercise of federal question jurisdiction over the disputed issue on removal, which would not distort any division of labor between the state and federal courts, provided or assumed by Congress." *Id.* at 310 (emphasis added).

As the majority concedes, even the Supreme Court's subsequent ruling in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 126 S.Ct. 2121 (2006), has "not shut the jurisdictional door propped open in *Grable*." *See* Maj. Op. at 11. *Empire* involved a dispute concerning a federal employee's insurance carrier's attempt to obtain reimbursement from the insured after the estate of the federal employee recovered damages "(unaided by the carrier-administrator) in a state-court tort action against a third party alleged to have caused the accident." *Id.* at 2127. Concluding that such a quintessential state-law contribution claim does not raise a substantial federal question, even though a federal employee's recovery pursuant to a federal employees' insurance policy was at issue, the Court emphasized numerous differences in the *Grable* and the *Empire* scenarios.

Foremost among those differences was the simple fact that *Grable* "centered on the action of a federal agency (IRS) and its compatibility with a federal statute." *Empire*, 126 S.Ct. at 2137. The Court further explained that the federal question in *Grable* was substantial, that judicial resolution of the question would be dispositive of the case before it, as well as of future cases, and that the dispute involved a pure issue of law. *See id.*

Despite the Court's successful effort in *Empire* to distinguish the situation presented in that case from the scenario in *Grable*, the justices have also recognized that there is no "single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties." *Grable*, 545 U.S. at 314 (internal quotation marks and citation omitted). "Instead, the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.*

In addressing that question in this action, the majority opinion first correctly concedes that a federal issue is indeed raised in the plaintiffs' complaint and that the federal issue "is actually disputed." *See* Maj. Op. at 11. Despite that concession, the majority asserts that the substance of the dispute is somehow minimized by the absence of participation by a federal agency, citing *Empire*'s recognition that *Grable* "centered on the action of a federal agency." *See* Maj. Op. at 13, citing *Empire*, 126 S.Ct. at 2137. Nowhere in *Grable* nor in *Empire*, however, did the Supreme Court indicate that agency participation in litigation constituted a *sine qua non* to the exercise of federal jurisdiction. Rather, such participation was merely one *factor* in reaching the ultimate conclusion that "the national interest in providing a federal forum for federal tax litigation is sufficiently substantial." *Grable*, 545 U.S. at 310. In this case, however, even in the absence of participation by a federal agency, the federal interest in the interpretation of federal tax laws still remains not only substantial, but paramount.

Indeed, as recognized by the majority, "resolution of this issue will require the analysis and interpretation of federal law, specifically the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 61(e), 98 Stat. 494 (1984), and 26 U.S.C. § 312." *See* Maj. Op. at 13. Furthermore, although "the specific question at issue [might] concern[ ] only the interpretation of the effective date of an accounting provision," that interpretation "governs certain earnings-and-profits calculations." *See* Maj. Op. at 13. Thus, the pure issue of law in this case – the effective date of a statutory provision – affects directly "how much tax security-holders must pay," *Mikulski v. Centerior Energy Corp.*, 435 F.3d 666, 678 (6th Cir. 2006) (Daughtrey, J., concurring in part and dissenting in part), and it is the amount of that tax collected from citizens, corporate and individual, that determines the levels of funding available for health, safety, and public welfare concerns; for programs and institutions designed to safeguard private rights, civil rights, and the general public interest; and for the daily operation of government activities including warfare, homeland security, and other aspects of national defense.

Perhaps the most disconcerting aspect of the majority's analysis of the "importance" of the question to be resolved in this case is its "subjective view . . . that this particular question is not particularly important to the federal government" because the IRS has not litigated a case involving the provision in the 22 years since its enactment. *See* Maj. Op. at 13. Clearly, such a lack of litigation bears no necessary correlation to the importance of the subject matter. As recognized by our sister circuit, for example, in the 216 years since the adoption of the Third Amendment to the United States Constitution, "[j]udicial interpretation of [that provision] is nearly nonexistent." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1043 (10th Cir. 2001). The Third Amendment's prohibition on the quartering of soldiers in private residences without consent is, however, one of the constitutional bulwarks protecting privacy rights inherent in American citizenship. Especially in this time of seemingly unfettered governmental efforts to intrude into private realms, I would hope that the majority would not equate the "nearly nonexistent" litigation

involving the Third Amendment with a lack of importance of the principles protected by that provision.

In its next effort to bolster its declaration that the issue presented in this litigation is not substantial, the majority claims that resolution of the inquiry into the propriety of Centerior's earnings and profits calculation is not necessarily dispositive of this case. *See* Maj. Op. at 13. As I noted in my partial dissent in the original panel treatment of this case, however:

> [T]he question of Centerior's compliance with Section 312(n)(1) of the Code . . . is central to the plaintiffs' state law claim . . . [and] also supports the district court's exercise of federal jurisdiction. In their complaint, the plaintiffs charged that the defendants "failed to follow and apply the structure and conceptual framework of the tax laws, as set forth in the Internal Revenue Code and the regulations promulgated thereunder." They also answered an interrogatory intended to clarify their claims with the statement that "Centerior violated the Internal Revenue Code by doing what . . . the Code specifically forbids . . . ." Furthermore, at oral argument on the issue of federal jurisdiction before the district court, the attorney for the plaintiffs acknowledged that an analysis of the tax code is "critical" to the case and that a violation of the Code is not only the measure of damages but also the "underlying rationale for the fraud." The majority asserts that in analyzing the plaintiffs' claims, a federal court would "engage in only insubstantial analysis or interpretation of federal law," but this conclusion fails to recognize that determining whether the defendants complied with the Code is essential to a resolution of the plaintiffs' claims.

*Id.* at 677-78 (Daughtrey, J., concurring in part and dissenting in part).

Finally, the majority submits that a recognition of federal jurisdiction in this limited instance raises "the possibility of encumbering the federal courts with these tax-code related cases." *See* Maj. Op. at 15. I continue to believe, however, that it is instead more likely than not "that the refund procedures in the Internal Revenue Code, in conjunction with state statute of limitations, would act as a reasonable limit on the number of cases that were actually heard in federal court." *Id.* at 678 (Daughtrey, J., concurring in part and dissenting in part). To the extent that they do not, we and our federal colleagues around the country will, I am convinced, continue to perform our sworn duties to judge those matters raising substantial federal questions, whatever they may turn out to be.

For these reasons, I concur in the majority's preemption analysis, but I respectfully dissent from the remainder of the majority opinion and would thus affirm the district court's denial of the plaintiffs' motion to remand this matter to state court. I am authorized to say that Judges Martin, Moore, Cole, and Clay join in this separate opinion.