**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0128n.06
Filed: February 12, 2009

No. 07-6419

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LARRY C. LAY; ROGER DALE PHILPOTT, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF TENNESSEE. |
| | ) | |
| BURLEY STABILIZATION CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: MOORE, GRIFFIN, and BRIGHT,** [*] **Circuit Judges.**

**PER CURIAM**. Plaintiffs and appellants Larry C. Lay, et al., fifty-five members of appellee

Burley Stabilization Corporation ("BSC") ("members"), are tobacco producers who sold burley

tobacco through the federal price support program in one or more of the 1982 through 2004 crop

years. They appeal the district court's[1] dismissal of their case without prejudice, seeking funds

allegedly wrongfully being withheld from them by BSC. The members contest the district court's

subject matter jurisdiction, contend that collateral estoppel does not bar the action, and argue that

their claims do not implicate state statutory requirements for derivative actions. We determine that

---

[*]The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1]The Honorable Thomas W. Phillips, United States District Court for the Eastern District of Tennessee.

the necessary federal jurisdiction exists and affirm, ruling that collateral estoppel applies and that

Tennessee law classifies the members' claims as derivative.

## I.    BACKGROUND

Appellee BSC, a non-profit agricultural cooperative association organized in 1953 under

Tennessee law, delivered federal price support payments to growers of burley tobacco within

portions of Tennessee, North Carolina, and Virginia.  Appellants, fifty-five members of BSC and

tobacco producers, received federal price support on burley tobacco sold through the federal price

support program in one or more of the 1982 through 2004 crop years.  Members assert class claims

on behalf of approximately 140,000 additional tobacco growers and BSC members, seeking

disgorgement of funds that BSC allegedly owes them.

BSC worked through the Commodity Credit Corporation ("CCC") and the United States

Department of Agriculture ("USDA") to administer the federal tobacco price support program within

the congressional framework first created by the Agricultural Adjustment Act of 1938, which

established a program of federal tobacco quotas and price supports aimed at stabilizing and

increasing the prices paid to America's tobacco growers.  7 U.S.C. §§ 1281 *et seq*.

In brief, the USDA annually set a support price level for various types of eligible tobacco.

CCC then made loans to grower associations such as BSC, who used the loans to purchase eligible

tobacco through various tobacco auctions at the support price when a grower could not obtain a

higher price on the open market.  CCC would take a security interest in the tobacco.  BSC then

processed and stored the tobacco, later attempting to resell it at a price sufficient to repay CCC and

recover the processing and storage costs.  If BSC realized more from the sale of a particular tobacco

crop than necessary to repay CCC and recover its costs, the tobacco growers who produced that particular crop received the surplus, called "Net Gain." If the proceeds from the sale of a particular crop were insufficient to repay the loans, however, CCC absorbed the loss at taxpayers' expense and without recourse against either BSC or its individual grower-members. *See Leaf Tobacco Exps. Ass'n, Inc. v. Block*, 749 F.2d 1106, 1108-09 (4th Cir. 1984) (describing the price support program); *Strickland v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 643 F. Supp. 310, 313 (D.S.C. 1986) (same).

The No Net Cost Tobacco Program Act ("1982 Tobacco Act") significantly amended the price support program. 7 U.S.C. §§ 1445-1, 1445-2, *repealed by* American Jobs Creation Act of 2004, Pub. L. 108-357, 118 Stat. 1523, codified at 6 U.S.C. § 612(a). The 1982 Tobacco Act intended to relieve taxpayers of the cost of the price support program by limiting federal tobacco expenditures to administrative costs. *See Strickland*, 643 F. Supp. at 313. The 1982 Act therefore required cooperative grower associations such as BSC to establish a "No Net Cost Account" with the CCC. CCC maintained and controlled these accounts, which provided recourse for CCC to ensure repayment of its loans. Therefore, if a cooperative grower association such as BSC realized more revenue from the sale of price support tobacco than necessary to satisfy the CCC loans related to the crop, then the CCC would retain the Net Gains to offset losses incurred on the 1982 and subsequent tobacco crops, thereby reducing the balance on other outstanding loans so that taxpayers would not need to fund the program. *See* 7 U.S.C. §§ 1445-1, 1445-2, *repealed by* American Jobs Creation Act of 2004, Pub. L. 108-357, 118 Stat. 1523, codified at 6 U.S.C. § 612(a).

With the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"), Congress effectively terminated the tobacco price support program. Under FETRA, CCC can dispose of certain collateral tobacco in a manner determined by the Secretary of Agriculture. *See* 7 U.S.C. § 519 (b)-(c). FETRA directs CCC to apply receipts from any such tobacco sales, together with the funds in a cooperative association's No Net Cost Account, toward any outstanding CCC loans. *See id*. Pursuant to FETRA, any funds remaining in the No Net Cost Account after CCC received full repayment were to be transferred to the cooperative for distribution to the "producers of quota tobacco in accordance with a plan approved by the Secretary." *See id.* § 519(d).

Members filed this action on May 25, 2007 in the Knox County, Tennessee Chancery Court, laying claim to three specific pools of money: the proceeds BSC received when it sold the 1982 Pool Crop of tobacco, the proceeds BSC received when it sold tobacco from the 1983-2004 Pool Crops, and the proceeds BSC received or will receive when it sells the tobacco CCC released to it under FETRA. BSC removed the action to the district court.

On March 14, 2007, the district court entered an order dismissing members' complaint against BSC without prejudice, classifying their claims as derivative and not in conformity with Tennessee statutory requirements for derivative actions. The district court also granted BSC's motion to dismiss based on collateral estoppel, determining that the same class of people as members filed a similar suit against BSC and its directors and officers in the Knox County, Tennessee Circuit Court in February of 2005. Members timely appealed the present case, arguing that the district court lacked federal jurisdiction, improperly determined that collateral estoppel barred the action, and erred in dismissing the claims without prejudice.

## II.   ANALYSIS

This court reviews de novo subject matter jurisdiction, the district court's dismissal of a complaint under Rule 12(b)(6), and collateral estoppel claims. *Smith v. Nationwide Property and Cas. Ins. Co.*, 505 F.3d 401, 404 (6th Cir. 2007); *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 671 (6th Cir. 2006)*; Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005).

Members argue that the federal courts lack jurisdiction on the basis that their claims do not rest on federal law. However, one of their claims expressly raises a federal question: members asserted in the pleadings that they were entitled to the proceeds from the sale of the loan pool tobacco "pursuant to FETRA." Even if members had cast their claims as state law causes of action, however, federal jurisdiction exists where the cause presents a substantial question of federal law. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997). As the district court noted, the 1982 Tobacco Act and FETRA created members' claims, which require resolution of substantial issues under federal law. Members' claims also charge that BSC served as an agent of a federal agency and that federal law governed its conduct in helping to administer the federal price support program. We therefore determine that federal subject matter jurisdiction exists in this case.

We consider next whether collateral estoppel prevents members from bringing this lawsuit. Members cannot relitigate an issue when 1) the issue in subsequent litigation is identical to that resolved in the earlier litigation, 2) the issue was actually litigated and decided in the prior action, 3) the issue was necessary and essential to a judgment on the merits in the prior litigation, and 4) the party to be estopped was a party to the prior action or in privity with the party. *See Hickman v. Comm'r of Internal Revenue*, 183 F.3d 535, 537 (6th Cir. 1999).

Members argue that the first two elements preclude the application of collateral estoppel in this case. Specifically, they argue that the Knox County Circuit Court decided only that the "totality" of the case makes it derivative, without making any specific findings as to the individual claims. Furthermore, members point to the differences between the previous suit and this one as follows: 1) the prior action lacked a claim for declaratory relief with respect to the tobacco released to BSC under FETRA, and 2) BSC's individual officers and directors no longer serve as defendants and no claim for breach of fiduciary duty exists.

These arguments lack merit. The Knox County Circuit Court already decided, and the district court agreed, that Tennessee law classifies members' claims as derivative. Members could have appealed this result instead of collaterally attacking it. Furthermore, the issues in both rounds of litigation are identical and members' added request for declaratory judgment relies on the same allegations underlying the other claims. Finally, members named BSC as a defendant in both suits, making the absence of BSC's individual officers and directors in the subsequent litigation irrelevant. Even though members named individual officers in the original suit, however, they did not cast the original suit in the form of a derivative action so it could only have been against BSC. Thus, collateral estoppel applies.

But even if collateral estoppel did not apply, members' pleadings of their claims failed to meet the statutory requirements for derivative suits. Tennessee state law determines whether plaintiffs' claims are derivative or direct. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 407-10 (6th Cir. 2006). Here, members essentially claim that BSC mismanaged its assets and call for an accounting of the funds. Tennessee law has classified such claims as derivative in

nature. *See, e.g.*, *id.* at 407-410 (viewing proposed class claims for accounting and distribution of electric cooperative revenues as derivative); *Davis v. Appalachian Elec. Co-op., Inc.*, 373 S.W.2d 450, 453-54 (Tenn. 1963) (classifying members' claims to recover electric cooperative funds as derivative); *Range v. Tenn. Burley Tobacco Growers Ass'n*, 298 S.W.2d 545, 549 (Tenn. Ct. App. 1955) (noting that "stockholders [grower-members of defendant tobacco cooperative] have their remedy within the corporation").

Members' derivative claims must be brought pursuant to T.C.A. § 48-56-401, which in part provides: "A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the directors and either why the plaintiffs could not obtain the action or why they did not make the demand." *Id.* at § 48-56-401(c). Members have failed to comply with statutory requirements and therefore the district court properly dismissed their action without prejudice.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment dismissing members' action against BSC.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I concur in the majority's conclusions that (1) removal of this action to federal court was proper, (2) issue preclusion bars the instant suit because the identical issue of whether plaintiffs' claims are derivative or direct was litigated and decided in a previous suit between the parties, and (3) even if issue preclusion did not apply, the plaintiffs' claims are derivative under Tennessee law and the plaintiffs have failed to comply with the demand requirement for derivative suits. I write separately to explain my disagreement with the majority on the proper basis for removal of this action to federal court and to explain my reasoning on the other issues in detail.

## I. FEDERAL-QUESTION JURISDICTION

The majority concludes that there is federal-question jurisdiction over the plaintiffs' claims on two alternate grounds: (1) the plaintiffs have actually pleaded a federal cause of action, or (2) the plaintiffs' claims present a substantial question of federal law. I respectfully disagree. First, the majority suggests that the plaintiffs have actually pleaded a federal cause of action based on the fact that the complaint uses the language "pursuant to FETRA." *See, e.g.*, Joint Appendix ("J.A.") at 58 (Compl. ¶¶ 73-75). However, under the well-pleaded-complaint rule, "[t]o determine whether the claim arises under federal law, we examine the 'well pleaded' allegations of the complaint and ignore potential defenses." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). Here, each of the plaintiffs' seven claims are explicitly pleaded as state-law claims. One exception to the well-pleaded-complaint rule is the artful-pleading doctrine, which provides that plaintiffs may not avoid removal by artfully pleading essentially federal-law claims as state-law claims. *Federated Dep't*

*Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981). That exception, however, does not apply here. The Fair and Equitable Tobacco Reform Act of 2004 ("FETRA") does not include a civil-suit provision, nor do the parties suggest that it implies a private right of action. Given that there is no federal claim that might have been asserted by the plaintiffs, it is clear that the plaintiffs did not artfully draft their complaint to avoid invoking a federal statute as the basis for their claims.

I also cannot agree with the majority's conclusion that there is federal "arising under" jurisdiction over the plaintiffs' state-law claims under the substantial-federal-question doctrine. "Under the substantial-federal-question doctrine, a state law cause of action may actually arise under federal law, even though Congress has not created a private right of action, if the vindication of a right under state law depends on the validity, construction, or effect of federal law." *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007) (en banc), *cert. denied*, — U.S. —, 128 S. Ct. 2426 (2008). The Supreme Court has explained that federal-question jurisdiction exists over a state-law claim only if that claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc., v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see also Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006) (applying *Grable*). We have summarized the requirements for federal-question jurisdiction under *Grable* as follows: "(1) the state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; (3) the exercise of jurisdiction

must not disturb any congressionally approved balance of federal and state judicial responsibilities."

*Mikulski*, 501 F.3d at 568 (citing *Grable*, 545 U.S. at 314).

None of the plaintiffs' claims appear to raise necessarily a disputed federal issue. Defendant Burley Stabilization Corporation ("BSC") primarily points to language in the plaintiffs' complaint stating that "*[p]ursuant to the FETRA*, the producer/members of the BSC are entitled to a distribution of the net proceeds from the sale of the loan pool tobacco." J.A. at 58 (Compl. ¶ 75) (emphasis added). At first glance this appears to present a federal issue. However, a closer look at FETRA and the plaintiffs' complaint indicates that FETRA does not speak to this issue and that the cited language was probably an unintended drafting error by the plaintiffs. It is undisputed that pursuant to FETRA the Commodity Credit Corporation ("CCC") released some 16.1 million pounds of tobacco to BSC in 2005. The plaintiffs contend that BSC now must distribute the net proceeds from the sale of that tobacco (the "FETRA tobacco") to its members (i.e., the putative plaintiff class). Although the language cited above suggests that the plaintiffs assert their interest in the FETRA tobacco based on FETRA, this is not the case. The plaintiffs have repeatedly maintained that their right to a distribution of these proceeds rests solely on state-law grounds. Moreover, nothing in FETRA speaks to the issue of whether a grower association must distribute to its members the proceeds it receives when it sells the tobacco released to it by the CCC pursuant to FETRA. As part of the winding-up of the federal-tobacco-support program, FETRA directs the CCC to transfer certain loan-pool tobacco to associations for their disposal. *See* 7 U.S.C. § 519(b). However, FETRA is simply silent on what an association must do with the proceeds from the sale of that

tobacco, and, not surprisingly, BSC points to no specific provision of FETRA that speaks to this issue. Because FETRA does not control the disputed question of whether BSC must distribute proceeds from the FETRA tobacco to the plaintiffs, I believe that the majority errs in premising federal-question jurisdiction on FETRA.

BSC also contends that there is a substantial federal question involving the interpretation of a provision of the federal No Net Cost Tobacco Program Act, 7 U.S.C. §§ 1445-1 to -2 (repealed 2004) ("1982 Tobacco Act"). The plaintiffs' complaint alleges that pursuant to the Tennessee Cooperative Marketing Law and Tennessee common law, BSC must distribute to its members (i.e., the putative plaintiff class) the net profits that BSC realized from the sale of certain tobacco from the 1983–2004 pool crops. The plaintiffs allege that "the CCC released its interest in certain tobacco pledged as security for the 1983–2004 crop year loans and any proceeds received by the BSC from the sale of the tobacco collateral." J.A. at 61 (Compl. ¶ 90). Consequently, according to the plaintiffs, the BSC realized profits on the sale of that tobacco "free and clear of any claim or interest of the CCC" and should have distributed those profits to its members. *Id.* BSC counters that "this claim is completely erroneous because, at all times relevant, the 1982 Tobacco Act mandated that CCC 'shall retain the net gains from each of the 1982 and subsequent crops' to offset past and future tobacco program losses." BSC Br. at 32-33 n.18 (quoting 7 U.S.C. § 1445-1(d)(5)). According to BSC, this presents a federal issue sufficient to confer jurisdiction under the substantial-federal-question doctrine. However, BSC's invocation of this provision is properly characterized as a federal *defense* to the plaintiffs' state-law claims. Under the well-pleaded complaint rule, "[t]o

determine whether the claim arises under federal law, we examine the 'well pleaded' allegations of the complaint and ignore potential defenses." *Anderson*, 539 U.S. at 6. "'[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Id.* (quoting *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) (alteration in *Anderson*)). Here, the plaintiffs base their claims entirely on Tennessee law and do not assert claims based on the 1982 Tobacco Act.[2] Instead, it is BSC that asserts the 1982 Tobacco Act as a federal defense to the plaintiffs' state-law claims. Only in limited circumstances and under specialized jurisdictional statutes may removal be based on a federal defense. I now turn to one of those specialized statutes: the federal officer removal statute, 28 U.S.C. § 1442.

## II. FEDERAL OFFICER REMOVAL STATUTE

As an alternative ground for removal, BSC asserts that it was entitled to remove the action to federal court pursuant to the federal officer removal statute.[3] I would affirm the district court's

---

[2]The plaintiffs do refer the 1982 Tobacco Act in their complaint. *See, e.g.*, J.A. at 58 (Compl. ¶¶ 71-73). However, these references simply provide background and do not form the basis for any of the plaintiffs' claims.

[3]The federal officer removal statute provides in relevant part:
A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

determination that removal was proper on this alternative ground. The statute "permits removal only if [BSC], in carrying out the 'act[s]' that are the subject of the [plaintiffs'] complaint, was 'acting under' any 'agency' or 'officer' of 'the United States.'" *Watson v. Philip Morris Cos.*, 551 U.S. 142, 127 S. Ct. 2301, 2304 (2007) (quoting 28 U.S.C. § 1442(a)(1) (second alteration in original)). Further, a defendant seeking removal under the statute must allege a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 129 (1989). Because BSC (like other grower associations) played a special role in the administration of the federal government's tobacco-price-support program, the acts complained of by plaintiffs relate to the administration of that program, and BSC asserts a colorable federal defense, I believe that the action is removable under § 1442.

First, I believe that BSC meets the requirement that it was "acting under" a federal "officer" or "agency." The Supreme Court recently clarified the circumstances under which a private firm may fall within the scope of statutory requirement of "acting under" a federal official or agency. *See Watson*, 128 S. Ct. 2301. In *Watson*, the Court rejected the cigarette manufacturer Philip Morris's contention that it was "acting under" federal officers based upon the high level of federal regulation of the company's operations and the fact that it conducted laboratory testing of cigarettes under the close supervision of the Federal Trade Commission, a federal agency. The Court began by explaining that "acting under" implies a relationship that "typically involves 'subjection, guidance, or control.'" *Id.* at 2307 (quoting Webster's New International Dictionary 2765 (2d ed. 1953)). It further noted that "the private person's 'acting under' must involve an effort to *assist*, or to help

---

28 U.S.C. § 1442(a)(1).

-13-

*carry out*, the duties or tasks of the federal superior." *Id.* Turning to Philip Morris's contention that the detailed federal regulation and supervision it received brought the company within the statutory requirement that it be "acting under" a federal "official," the Court concluded that "[a] private firm's compliance or (noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id.* at 2308. The Court noted that "[a] contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.*

In rejecting Philip Morris's invocation of the statute, the Court distinguished the case from lower court cases holding that "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999)). The Court explained that, unlike Philip Morris, the government contractors in those cases provided assistance that went "beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks." *Id.* For instance, in *Winters* the government contractor, Dow Chemical, "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war." *Id.* Thus, the government contractors in those cases "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.*

I believe that the special role played by grower associations such as BSC in helping to administer the federal tobacco-price-support program brings BSC within the scope of the statutory requirement that it was "acting under" a federal "officer." The 1982 Tobacco Act was intended "to limit federal tobacco expenditures to administrative costs." *Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1109 (4th Cir. 1984). In other words, it aimed to relieve taxpayers of the burden of supporting the program. To accomplish this goal, the Act required BSC and other grower associations to establish either a No Net Cost Tobacco Fund, 7 U.S.C. § 1445-1 (repealed 2004), or a No Net Cost Tobacco Account within the CCC, 7 U.S.C. § 1445-2 (repealed 2004), the latter of which was evidently established by BSC. The purpose of a No Net Cost Tobacco Account ("Account") was to ensure that the CCC—and therefore the taxpayers—suffered no net losses on the loans that the CCC made to associations on the 1982 tobacco crop and all later crops. *Id.* § 1445-2(e). Generally speaking, an Account had two different sources of funding. First, producers and purchasers of loan-pool tobacco were required to pay assessments into the Account on each pound of tobacco sold or purchased at rates set by the Secretary of Agriculture. *Id.* § 1445-2(d). When a producer delivered tobacco to an association, the association was required to collect the assessment from the producer and pay it into the association's Account at the CCC. 7 C.F.R. § 1464.10(i)(1)(iii) (removed 2005). Second, if an association such as BSC realized more revenue from the sale of a particular year's crop than necessary to repay the CCC on loans related to that crop, those profits, or "Net Gains," were also transferred to the Account. 7 U.S.C. §§ 1445-1(d)(5), 1445-2(h) (both repealed 2004). Consistent with this requirement, BSC asserts that the Net Gains on the sales of the 1983-2004 crops "were transferred to BSC's no Net Cost Account as they accrued." BSC Br. at 19

n.9. By collecting assessments from producers and by transferring the profits on the sales of each crop to an Account at the CCC, the BSC and other grower associations played an integral role in administering the tobacco-price-support program and ensuring, after 1982, that taxpayers would be relieved of the costs of the program.

Department of Agriculture regulations implementing the 1982 Tobacco Act further illustrate that grower associations such as BSC were charged with helping to administer the revised tobacco-price-support program under the guidance and supervision of the CCC, a federal agency. The regulations provided that the program would be "carried out by cooperative marketing associations . . . acting on behalf of their producer members," but would be "under the general direction and supervision of the . . . CCC." 7 C.F.R. § 1464.1(a) (removed 2005). Thus, grower associations such as BSC generally carried out this government program, but the CCC directed and supervised how they did so. For instance, the CCC exercised detailed supervision and control over the contracts that associations such as BSC made to sell loan-pool tobacco. When an association contracted with a tobacco-auction warehouse to sell loan-pool tobacco, the contract was required to be "on a form of agreement approved by CCC." *Id.* § 1464.2(b)(1)(i). Further, when the CCC believed that a particular tobacco-auction warehouse would not honor its obligations under a contract with an association, the "CCC reserve[d] the right to direct the association to withhold a contract under the price support program" from that warehouse. *Id.* § 1464.2(b)(1)(iii).

Like the government contractors that have invoked successfully the federal officer removal statute in other courts, *e.g.*, *Winters*, 149 F.3d 387, I believe that grower associations such as BSC

provided assistance to the government that went "beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks." *Watson*, 127 S. Ct. at 2308. Under the general direction and supervision of the CCC, BSC and other associations played a crucial role in administering the program under the 1982 Tobacco Act by, among other things, collecting assessments from producers and remitting Net Gains from the sale of loan-pool tobacco to accounts maintained at the CCC, furthering the statute's goal that the program would have no net cost for taxpayers. In so doing, BSC and other associations "performed a job that," in their absence, "the Government itself would have had to perform." *Id.* Accordingly, I believe that BSC falls within the ambit of the statutory phrase "acting under" a federal "officer." 28 U.S.C. § 1442(a)(1).

To come within the scope of the statute, BSC must also have carried out the acts that are the subject of the plaintiffs' complaint while acting under a federal officer. *See Watson*, 127 S. Ct. at 2304. Further, BSC must allege a "colorable federal defense." *Mesa*, 489 U.S. at 129. I believe that these additional requirements are satisfied. As discussed above, the plaintiffs allege that BSC improperly retained the net profits from the sale of the 1983–2004 loan-pool tobacco instead of distributing those profits to its members. The plaintiffs contend that because the CCC released to BSC any interest in certain tobacco for those crop years, the BSC realized profits on the sale of that tobacco "free and clear of any claim or interest of the CCC" and should have distributed those profits to its members. J.A. at 61 (Compl. ¶ 90). BSC's defense is that it was required to remit those profits to its No Net Cost Tobacco Account at CCC because "the 1982 Tobacco Act mandated that CCC 'shall retain the net gains from each of the 1982 and subsequent crops' to offset past and future

tobacco program losses." BSC Br. at 32-33 n.18 (quoting 7 U.S.C. § 1445-1(d)(5)). At least on BSC's theory of the case, BSC performed the acts complained of by the plaintiffs pursuant to its administrative obligations under the 1982 Tobacco Act and in accord with its agreements with the CCC. Similarly, BSC raises a "colorable federal defense" because it asserts that it was required by the 1982 Tobacco Act to remit the Net Gains on the sale of the 1983–2004 loan-pool tobacco to its Account at CCC and could not have distributed the Net Gains to its members. The plaintiffs apparently contend that the loan-pool tobacco at issue was not subject to the Act's requirement that Net Gains be remitted to the CCC Account. But that merely raises a fact question, and at this point BSC "need not prove the asserted defense, but need only articulate its 'colorable' applicability to the plaintiff[s'] claims." *Winters*, 149 F.3d at 400; *see also Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("The officer need not win his case before he can have it removed.").

Because I believe that BSC is within the scope of the federal officer removal statute, I would affirm the district court's ruling that removal was proper on this alternative ground.

### III. ISSUE PRECLUSION

I agree with the majority that issue preclusion (collateral estoppel) bars relitigation of the issue of whether plaintiffs' claims are derivative. As the majority explains, this issue was actually litigated and decided by the district court in a virtually identical prior action brought by the plaintiffs.[4] In the first suit, filed in state court and later removed to federal court, the district court

---

[4]In the first suit, the CCC as well as various officers and directors of the BSC were also named as defendants, whereas in the instant suit the plaintiffs name only BSC as a defendant. However, the allegations and claims against BSC in the two suits are virtually identical.

adopted an earlier ruling of the state court that the plaintiffs' claims against BSC were derivative under Tennessee law and dismissed those claims *without prejudice* because the plaintiffs had neither satisfied the demand requirement under Tennessee law nor shown that a demand would have been futile. In this second suit, six of the seven claims asserted against BSC are identical to claims asserted in the first suit. Only Count 1 in the instant suit is nominally different. The plaintiffs styled Count 1 in the first suit as a breach of fiduciary duty by current and former officers and directors of the BSC and requested distribution of funds in the BSC's No Net Cost Tobacco Account and proceeds from the sale of the FETRA tobacco. Count 1 in this suit is styled as a declaratory judgment action against BSC seeking a declaration that the members of the BSC are entitled to a distribution of the proceeds from the sale of the FETRA tobacco. Notwithstanding the change in the legal label put on Count 1, I agree with the majority's conclusion that the issue of derivative standing presented in the two suits is identical and that the district court's ruling in the first suit that the plaintiffs' claims are derivative is entitled to issue preclusive effect.

In the first suit, the district court dismissed the plaintiffs' claims *without prejudice*, so that the plaintiffs could reassert the same claims against BSC by curing the defects that led to the dismissal, i.e., by satisfying the demand requirement which is a precondition for derivative actions under Tennessee law. Because the plaintiffs did not cure this defect and instead simply modestly repackaged the same claims asserted in the first suit, the district court in the instant (second) suit again dismissed the plaintiffs' claims without prejudice, ruling that issue preclusion barred relitigation of the issue of derivative standing. Issue preclusion is appropriate here because the

plaintiffs could have appealed the district court's ruling in the first suit that their claims against BSC were derivative.[5]   When a district court "dismiss[es] . . . a complaint, as opposed to an action, without prejudice" that "is not a final and appealable order." *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007); *see Azar v. Conley*, 480 F.2d 220, 223 (6th Cir. 1973) (same).   However, when "the district court dismisses an *action* without prejudice, . . . the order is final and appealable." *Morgan Stanley*, 485 F.3d at 845 (internal quotation marks omitted).   Here, in the first suit, the district court issued, along with its memorandum and order of March 14, 2007, a final judgment dismissing all of the plaintiffs' claims against BSC "without prejudice" and dismissing the *action* in its entirety, not just the plaintiffs' complaint.   This was clearly an appealable final judgment.   The plaintiffs had an opportunity to appeal the district court's determination that their claims against BSC are derivative, but they declined to do so.

Because the issue of derivative standing was actually litigated and decided in the first suit and necessary to the resolution of the first suit, and because the plaintiffs had an opportunity to appeal that ruling, I agree with the majority that issue preclusion bars relitigation of this issue.

---

[5]By contrast, when an issue is not appealable, issue preclusion does not apply. *See Dixon v. Wallowa County*, 336 F.3d 1013, 1020 (9th Cir. 2003) ("Issue preclusion does not apply to an issue that is not appealable."); RESTATEMENT (SECOND) OF JUDGMENTS § 28(1) (1982) (stating that issue preclusion does not apply when "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action").

## IV.  DERIVATIVE NATURE OF CLAIMS

Finally, I agree with the majority that even if issue preclusion did not apply, the plaintiffs' claims are derivative under Tennessee law and therefore the district court properly dismissed the action for failure to comply with the demand requirement.  Our opinion in *McCarthy v. Middle Tennessee Electric Membership Corp.*, 466 F.3d 399, 407-10 (6th Cir. 2006), makes it clear that Tennessee law governs whether the plaintiffs' claims are derivative or direct.  Like *McCarthy*, the instant case essentially involves claims of "mismanagement, self-dealing, and breach of fiduciary duty."  466 F.3d at 410 (internal quotation marks omitted).  In essence, the plaintiffs maintain that BSC, a nonprofit agricultural cooperative, improperly failed to distribute to its members proceeds from sales of certain loan-pool tobacco as required by the Tennessee Cooperative Marketing Law and various common-law theories.  I believe that this case is indistinguishable from *McCarthy* and the Tennessee Supreme Court's decision in *Davis v. Appalachian Electric Co-operative, Inc.*, 373 S.W.2d 450 (Tenn. 1963), where similar claims for accountings and distributions of cooperative funds were classified as derivative rather than direct.